# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 12, 2006

_____

## DIALLO J. LAUDERDALE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Henry County**
**No. 13719    Julian P. Guinn, Judge**

_____

**No. W2005-02135-CCA-R3-PC   - Filed November 7, 2006**

_____

The petitioner, Diallo J. Lauderdale, was convicted by a Henry County Circuit Court jury of first degree felony murder, and the trial court sentenced him as a violent offender to life in the Department of Correction.  On direct appeal, this court affirmed the petitioner's conviction and sentence.  The petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing.  On appeal, the petitioner contends that the post-conviction court erred when it dismissed his petition because his trial counsel rendered ineffective assistance of counsel. After thoroughly reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Guy T. Wilkinson, District Public Defender for the Appellant, Diallo J. Lauderdale.

Michael E. Moore, Acting Attorney General & Reporter; Elizabeth B. Marney, Senior Counsel Criminal Justice Division; Robert Radford, District Attorney General; and Steve Garrett, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The following analysis of the sufficiency of the evidence, pertinent to the petitioner's conviction, appears in this court's opinion affirming his conviction:

> This case relates to the death of [the petitioner's] seven-year-old [daughter,] Dominique Porter. . . .

> . . . .

Viewed in the light most favorable to the state, the evidence is sufficient to support the conviction. Alecia Porter testified that she last saw the victim on May 25 and that the victim was fine at that time. On May 29, the victim went to the park without doing her chores and the [petitioner], who was the victim's sole caretaker, sent Keshonte Porter to get the victim. Keshonte testified that when she and the victim returned to the apartment, the [petitioner] whipped the victim in the bathroom, brought the victim into the living room, lifted the victim over his head, and slammed the victim onto the floor. The [petitioner] then splashed hot water on the victim in an attempt to revive her, put her into bed, and left the apartment. Although the [petitioner] at first told the police that the victim had been injured by falling out of bed, he later claimed that the victim had slipped in the bathroom and hit her head against the bathtub.

Dr. Mary Taylor testified that the victim was comatose when she arrived at Vanderbilt Children's hospital and had burns on the front of her body, bruises in the middle of her back, and scratch marks around her neck. She also testified that Dr. Frederick Barr discovered a fracture at the base of the victim's skull. Dr. Suzanne Starling testified that the victim's left arm was broken and that her skull fracture could have been caused by blunt force to the head. Dr. Starling concluded that marks on the victim's neck and the fact that only the left side of the victim's brain was swollen indicated that the victim could have been strangled, and Dr. Barr also stated that the victim's brain injury could have been caused by strangulation. Dr. Charles Harlan testified for the defense that he found no evidence of strangulation, that the victim's skull fracture was consistent with the victim's head hitting an edged surface, and that the victim had not been abused. However, Dr. O.C. Smith, who performed the victim's autopsy, testified that the victim died of blunt trauma to the head and compressive force to the neck and that the skull fracture could have been caused by the back of the victim's head hitting a flat or edged surface. Drs. Starling and Smith both testified that the [petitioner's] claim that the victim fell against the bathtub did not account for the victim's extensive injuries. The jury heard the inconsistencies and alternate theories raised by the state and the defendant and decided to accredit the state's theory of the crime. Based upon the medical testimony and Keshonte Porter's eyewitness account of the defendant dropping the victim, the evidence is more than sufficient to support the [petitioner's] conviction for first degree felony murder.

*State v. Diallo Jamel Lauderdale*, No. W2001-01296-CCA-R3-CD, slip op. at 1, 10 (Tenn. Crim. App., Jackson, Sept. 5, 2003).

After his conviction was affirmed, *see id.*, the petitioner filed a pro se petition for post-conviction relief on October 27, 2004. The petition was amended once by the petitioner appearing pro se, and after counsel was appointed, the petition was amended a second time. The post-conviction court conducted an evidentiary hearing on May 31, 2005. Counsel advised the court that the petitioner would not be proceeding on all grounds set forth in the various petitions, and counsel itemized the relevant grounds as follows:

>    (1) Trial counsel were ineffective by not filing a pretrial motion to dismiss the indictment for its failure to allege that the petitioner acted "unlawfully."

>    (2) Trial counsel were ineffective by failing to object to the use of the terms "unlawfully" in the jury instructions inasmuch as the indictment failed to allege that the petitioner acted "unlawfully."

>    (3) Trial counsel were ineffective by failing to notify the trial court that some jurors were sleeping.

>    (4) Trial counsel were ineffective by failing to object to members of the victim's family moving about the courtroom and speaking aloud.

>    (5) The trial court prejudiced the jury against the petitioner by the tone and manner used in addressing defense counsel, and counsel were ineffective by being intimidated by the trial court.

>    (6) One of the petitioner's minor children who testified at trial cried, appeared rehearsed, and was being coached by someone standing in the back of the courtroom; trial counsel did not effectively cross-examine this witness.

The petitioner testified at the hearing. He maintained that he personally observed one or two jurors sleeping during his trial, but he could not recall any names. The petitioner said that he did not bring the sleeping to his counsel's attention because he "thought it was obvious."

The petitioner explained the allegation about the victim's family moving around and talking in the courtroom; he said that "people were walking around going to the water fountain over there, laughing." He also said that "during the whole thing" people often spoke aloud. He thought his attorneys should have done something.

The petitioner testified that the trial judge was "sarcastic" and "rude" when speaking to defense counsel. The petitioner said the trial court acted inappropriately to defense counsel "during the whole trial." Asked to give an example, the petitioner said, "I don't know. Just when they had objections he would just – to me he would just elude [sic] how he – objected to it." As for

the effect of the trial court's behavior, the petitioner said that "[i]t might have thrown [his attorneys] off."

Keshonte Porter, the petitioner's daughter, testified for the State at trial. The petitioner testified at the evidentiary hearing that she began crying when defense counsel tried to cross-examine her, and the trial judge interjected, "[C]an't you just leave her alone, can't you see she's upset." In the petitioner's opinion, defense counsel were not "given the opportunity to cross-examine her like [counsel] should." The petitioner said he recalled one part of the cross-examination when defense counsel asked Ms. Porter if anyone had talked to her. She nodded toward prosecution counsel. The petitioner testified that Ms. Porter had a guardian ad litem who was present in the back of the courtroom when Ms. Porter testified. He said "[i]t seem like [the guardian ad litem] was telling [Ms. Porter] what to say, she was nodding at her."

On cross-examination, the petitioner agreed that he had been involved before in court proceedings, although he denied being on trial. The prosecution asked for greater specifics about the "sleeping" jurors. He thought the two jurors were sitting in seats three and six; one juror, the petitioner said, was an older gentleman with white hair, and the lady "coughed and sneezed the whole time the trial was going on."

The petitioner identified the people he claimed were milling about as the victim's mother, aunt, and grandmother. He insisted that they were walking around and speaking loudly even as witnesses were on the stand and being examined. The petitioner acknowledged that the trial court never warned the individuals or gave any instructions relating to such behavior.

The petitioner's mother, Archalean Lauderdale, testified that she observed "unorthodox" behavior in the courtroom. She said that one female juror "gave the family thumbs up signs," and the juror made an "okay" gesture when she came into the courtroom. Ms. Lauderdale described the woman's behavior as "almost as if she intimidate[d] the rest of the jurors." Ms. Lauderdale also mentioned that the juror knew the family and one of the detectives. Ms. Lauderdale said that she spoke to the petitioner's attorneys about the juror's behavior, but Ms. Lauderdale could not recall the conversation. She knew only that the woman remained on the jury panel.

Ms. Lauderdale testified that she observed a male juror and a female juror sleeping. She clarified that she saw the jurors sleeping on the last day of the trail.

Ms. Lauderdale voiced her opinion that State witnesses were "allowed to elaborate on questions" and "just run on." She believed that the petitioner's counsel felt intimidated by the trial court.

The petitioner's aunt, Marilyn Sweat, testified that she was present during the entire trial. She observed an older male juror sleeping during most of the trial. Ms. Sweat also said that she observed the victim's family moving about the courtroom and talking. She recalled on the last day of the trial that an older lady in the audience "hollered out get him." Ms. Sweat believed that the petitioner's attorneys were intimidated because the trial judge spoke in harsh tones to them and

told them to "get on with it." She was present when Keshonte Porter testified, and she saw the witness crying. Ms. Sweat asserted in a vague fashion that the petitioner's attorneys did not adequately cross-examine the witness about the details. While Ms. Porter was testifying, Ms. Sweat noticed a lady who was standing in the back of the courtroom and who was nodding her head and gesturing to the witness. On cross-examination, Ms. Sweat admitted that she never brought any of the matters to the attention of the petitioner's counsel.

The petitioner's aunt, Lavenia Crutcher, also was present during the trial. She testified that she observed two jurors who "had their eyes closed and appeared to be asleep." Ms. Crutcher did not observe the victim's family speaking out loud or moving about, but she noticed that two family members "kept going up to the water fountain." Ms. Crutcher claimed that a female juror "would make facial gestures, winking her eye to let [the victim's family] know that things were okay." Ms. Crutcher even claimed that the juror sat with the family for a few minutes during a recess.

Ms. Crutcher was uncertain whether the petitioner's attorneys were intimidated by the trial judge. She testified, "I don't know if he intimidated them or not because these attorneys, you know, they are good attorneys." Ms. Crutcher, however, was certain that Keshonte Porter was being coached by a lady standing at the back of the courtroom.

The State presented the testimony of both attorneys who represented the petitioner at trial. The first attorney to testify recalled one female juror who had her eyes closed at times; he did not recall seeing another juror who appeared to be asleep. He might have commented "during a break when we were in chambers" about not wanting the jurors to fall asleep. Neither the petitioner nor his relatives mentioned sleeping jurors.

Trial counsel did not observe family members moving about the courtroom while witnesses were testifying. He recalled that during recesses, when typically he would remain in the courtroom, people moved around some. The only instance counsel recalled being intimidated involved Keshonte Porter's testimony. Trial counsel testified that her testimony was different than any of her prior statements, and at one point during cross-examination, she refused to answer questions. Counsel asked the trial court to instruct the witness to answer, but the trial court told counsel to rephrase the questions. Counsel reacted, "I didn't really like that especially with the jury sitting in the box." Counsel conceded that in retrospect he should have moved to strike the witness's testimony.

Trial counsel recalled meeting with the petitioner on a regular basis. Trial counsel explained the defense theory of accident and how counsel located an expert witness. Trial counsel's memory was vague regarding pretrial motions, but he remembered arguments about dismissing the indictment and jury-instruction questions.

Trial co-counsel testified that he served in the first Gulf War and was in the Marine Corps Reserve. He agreed that the trial judge who conducted the petitioner's trial "has a very military style . . . very direct." Counsel said that the trial judge "wanted to move this case along .

-5-

. . and ensure that it proceeded . . . in a timely fashion." Counsel did not recall anyone disrupting the court proceedings; during a break, however, a juror and a family member walked to the water fountain, and something was said. Counsel's memory was that a bailiff intervened and told the individuals not to conduct any conversations.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On September 1, 2005, the court issued a written order dismissing the petition for post-conviction relief. The court began by declaring that the petitioner's grounds for relief had been waived, *see* T.C.A. § 40-30-106(g) (2003), and/or previously determined, *see id.* § 40-30-106(h). Even so, the post-conviction court addressed each allegation on the merits, providing factual findings, credibility determinations, and a cogent, succinct analysis of the various claims.

First, the post-conviction court found no basis for relief relating to the wording of the indictment and jury instructions and nothing ineffective in how counsel handled these matters. Second, the court concluded, "There were no sleeping jurors during the trial," and it noted that the petitioner's witnesses failed to agree on the identity of the jurors claimed to have been sleeping. Third, the post-conviction court found no support in the trial record for the claim that one or more individuals in the spectator section of the courtroom were disruptive, but even if such an event occurred the court noted that "there is certainly no proof, even at this late date, as to who it was, what was said and, most importantly, it had any effect whatsoever upon any juror." Fourth, the post-conviction court pointed out that trial counsel never objected to the court's manner of addressing counsel, and the record failed to reveal or support that trial counsel were intimidated. Fifth, regarding the nine-year-old witness, Keshonte Porter, the post-conviction court explained that a guardian ad litem was present during the trial but was not identified for the jury; the petitioner's evidence failed to establish that anyone was sending signals to Ms. Porter during her testimony. In conclusion, the court stated, "Quite simply stated, there is nothing to be found anywhere in the record that even remotely suggests an abridgement of any right guaranteed the petitioner by the Constitution of the United States of America or the State of Tennessee."

As we shall explain, our review convinces us that the petition was appropriately dismissed.

**Standard of Review and Ineffective Assistance of Counsel**

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. *Id.* § 40-30-110(f). A post-conviction court's factual findings are subject to a de novo review by this court; however, we must afford these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this court, with no presumption of correctness. *Id.* at 457.

To establish an abridgement of the right to the effective assistance of counsel as guaranteed in the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, the claimant must show both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002); *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067 (1984). Deficient performance of counsel equates to "acts or omissions [that] were so serious that they fell below an objective standard of reasonableness under prevailing professional norms." *Nichols*, 90 S.W.3d at 587. The court reviewing counsel's performance not only evaluates the claimed deficiency from counsel's perspective at time of the alleged acts or omissions, but it also indulges "a heavy measure of deference to counsel's judgments." *Id.*; *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). Counsel should not be deemed to have rendered deficient performance merely because a different procedure or strategy might have produced a different result. *See Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

To establish that deficient performance resulted in prejudice, the claimant is required to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. The claimant "must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome." *Nichols*, 90 S.W.3d at 587. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. *Burns*, 6 S.W.3d at 461.

At the outset, we disagree with the post-conviction court that the petitioner's grounds for relief were waived and/or previously determined. A post-conviction court is directed to dismiss any petition for post-conviction relief that claims relief for issues that have been waived or previously determined. T.C.A. § 40-30-106(f) (2003). Section 40-30-206 defines "waived" and "previously determined" as follows:

> (g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.
>
> (h) A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is

-7-

afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

*Id*. § 40-30-106(g)-(h).

In this case, the petitioner couched his claims in terms of ineffective assistance of counsel. His post-conviction petition is the first one that he has filed, and ineffective assistance of counsel was not presented or previously determined on direct appeal. These claims, accordingly, are not barred as having been waived or previously determined. *See Perry Saleem Lee v. State*, No. M2001-01141-CCA-R3-PC, slip op. at 2 (Tenn. Crim. App., Nashville, Dec. 13, 2001) (discussing under what circumstances ineffective assistance of counsel may have been waived or previously determined); *see also Kendricks v. State*, 13 S.W.3d 401 (Tenn. Crim. App. 1999).

Nevertheless, in our estimation, the evidence overwhelmingly supports the post-conviction court's findings on the merits of the ineffective assistance of counsel claims, and on that basis, we affirm the dismissal of the post-conviction petition. The court made reasonable credibility determinations and deductions that supported its conclusion that the petitioner received effective assistance of counsel, and the petitioner on appeal simply restates his complaints. Nothing persuades us that the dismissal of his petition was erroneous. The petitioner wholly failed to carry his burden of demonstrating entitlement to relief.

## Conclusion

In conclusion, we find no reversible error and affirm the post-conviction court's denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE

-8-